IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 27, 2010

## STATE OF TENNESSEE v. JOE MICHAEL TURNER

**Direct Appeal from the Criminal Court for Knox County**
**No. 85422     Bob R. McGee, Judge**

_____

**No. E2009-00069-CCA-R3-CD - Filed September 22, 2010**

_____

The appellant, Joe Michael Turner, was convicted by a Knox County Criminal Court Jury of two counts of aggravated rape, one count of especially aggravated kidnapping, three counts of aggravated kidnapping, and one count of aggravated assault. The trial court imposed an effective sentence of one hundred years in the Tennessee Department of Correction. On appeal, the appellant challenges the sentences imposed by the trial court. Upon review, we conclude that the trial court should have merged the kidnapping convictions. Therefore, the judgments of conviction for the especially aggravated kidnapping and the aggravated kidnappings are vacated and the case is remanded for entry of a judgment of especially aggravated kidnapping that includes the merged aggravated kidnapping convictions. The judgments of the trial court are affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part; Reversed in Part; and Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Albert J. Newman, Jr. (on appeal) and Mitchell Harper (at trial), Knoxville, Tennessee, for the appellant, Joe Michael Turner.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Philip H. Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

At trial, the victim, A.T.,[1] testified that at the time of the offenses she was addicted to drugs and alcohol but that she had been "sober" for more than a year. The victim said that she met the appellant on Keith Avenue one to one and one-half months prior to the instant offenses. She and the appellant started a relationship, and they occasionally used crack cocaine and alcohol.

In August 2006, the victim was hired to clean rooms at the Best Value Inn in exchange for room and board. The appellant stayed with her. He promised to look for employment; however, after job searching, he often came back to the room drunk or with crack cocaine.

The victim testified that at times the appellant was violent. He took her belongings and threatened to burn them. He would also "strip [her]" so that she was unable to leave. He frequently grabbed her arms and physically restrained her. She said she did not want to be with the appellant, but she was afraid of him.

The victim worked at the motel for one week before her job was terminated on August 16, 2006. The night before she lost her job, the appellant kept the victim awake until 3:00 a.m. "ranting and raving," making it difficult for her to work the next day. The victim said that on August 16, the appellant left to look for a job, and she began cleaning rooms. Her boss called her downstairs and told her he had to "let her go." The victim asked to be given a reason for her dismissal, and her boss responded that the appellant had been harassing the guests. The victim asked if she could continue to stay and work at the motel if she evicted the appellant, but her boss told her that they both needed to leave. The victim left the appellant's belongings at the motel because she was unable to carry them. She told the motel clerk that the appellant would return later for his belongings.

At 5:00 or 5:30 p.m., after arranging to stay with a woman who lived on Keith Avenue, the victim went to a nearby convenience store. While she was there, the appellant confronted her. He was angry and cursing because she had left his belongings at the motel. She told him that the relationship was not working and that his behavior had cost her a job and a place to stay. The victim left the store and went to the house where she was staying.

At 10:00 or 11:00 p.m., the victim returned to the store and bought a quart of beer. When she walked out of the store, the appellant grabbed the "neck area" of her shirt with one hand. In his other hand, he had an open Buck knife. The appellant repeatedly called the victim a "bitch." He held the knife to her throat, threatened to kill her, and dragged her to a dirt pile behind the store. The appellant told her that "no one else was going to have [her]"

---

[1] It is the policy of this court to refer to victim's of sexual offenses by their initials.

and threatened to "rape [her] dead body." Hoping to get the appellant to stop, the victim told him that God was watching them. The appellant responded by hitting both sides of her head and pushing her onto the dirt pile. The victim said the appellant was angrier than she had ever seen him.

The appellant ordered the victim to remove her clothes, and she reluctantly complied. She pled with the appellant to let her go. He used profanity, strangled her, and kept the knife near her face and neck. The victim briefly lost consciousness while the appellant strangled her. After the victim's clothes were removed, the appellant penetrated her vagina with his penis then ejaculated on her face. The appellant laughed, kicked dirt on her, and ordered her to get dressed.

The appellant then forced the victim to go to an abandoned house which was dark and smelled of urine. The appellant pushed the knife into her neck and ordered the victim to lie on a blue couch that was in the house. When she complied, he penetrated her again.

Afterward, the appellant appeared to be asleep. When the victim saw that it was getting light outside, she squirmed out from under the appellant and stood. She told him she would not tell police about the rapes if he allowed her to leave. The appellant allowed her to leave, but he followed her out of the house. She found a telephone and called 911. The victim said she was disoriented, confused, weak, and had trouble breathing because of the strangulation.

An ambulance arrived and transported the victim to Baptist Hospital where she was examined. Later, she went to an out-of-county domestic violence shelter because she was afraid of the appellant. The victim stated that the ordeal lasted from 10:30 p.m. on August 16, 2006, until 7:30 a.m. on August 17, 2006.

The victim said that the appellant always carried a knife and that he liked to "flip" knives at odd times, such as when he watched television. Because of the strangulation, she had trouble swallowing for a month. She said that she had bruises and scrapes and that she healed slowly. She also stated that "mentally those scars are a lot deeper." She acknowledged that she had previously had consensual sex with the appellant but maintained that she did not consent on the night of the offenses.

Ginger Evans testified that on August 17, 2006, she was called to Baptist Hospital Emergency Department to perform a sexual assault forensic examination on the victim. When Evans first saw the victim, she was curled in a "fetal position" on an examination table. She was crying and was clearly upset. The victim told Evans that she was scared, and she asked Evans to find her a safe place to stay.

The victim told Evans that she had been sexually assaulted and strangled by the appellant. Evans said that the victim complained of pain and that she had marks and scratches on her body. Evans stated that the victim had broken blood vessels in her eyes and significant bruises on her neck, ears, and chin which were consistent with strangling. Evans found dirt in various places on the victim's body, including her genital area, which could have been consistent with the victim being thrown on a pile of dirt. Additionally, Evans collected swabs from the victim's face and genital area. When she examined the victim's genital area, she saw redness and excoriation, which she described as a tearing away of the top layers of skin where the victim's legs connected with her pubic bone.

Kimberly Bryant, a Tennessee Bureau of Investigation forensic scientist, testified that the swab from the victim's face revealed the presence of limited spermatazoa. She said that the appellant's genetic material was present in the swab.

Knoxville Police Department Investigator Steve Sill testified that he was working in the Violent Crimes Unit around 7:30 a.m. on August 17, 2006, when he received a call to respond to Baptist Hospital to investigate a rape complaint. When he arrived at the hospital, the victim was "very emotional, scared, upset. Obviously in some type of a crisis." Investigator Sill said the victim had bruises on her face, neck, arms, and legs, which corroborated her story.

Later that day, Investigator Sill went to the convenience store where the offenses occurred. He noticed a depression on the dirt pile behind the store. He walked the neighborhood and found an abandoned blue house and couch, which matched the victim's descriptions.

The appellant chose not to put on proof. The jury found the appellant guilty of the charged offenses of two counts of aggravated rape, one count of especially aggravated kidnapping, three counts of aggravated kidnapping, and one count of aggravated assault. At the sentencing hearing, the trial court sentenced the appellant as a persistent offender to consecutive sentences of fifty years for the aggravated rape convictions. The court also sentenced the appellant as a persistent offender to fifty years for the especially aggravated kidnapping conviction and ordered that sentence be served concurrently with one of the aggravated rape sentences. Finally, the trial court sentenced the appellant as a career offender to thirty years for each aggravated kidnapping conviction and fifteen years for the aggravated assault conviction and ordered that those sentences be served concurrently with the other sentences, for a total effective sentence of one hundred years. On appeal, the

appellant challenges the length of the sentences and the imposition of consecutive sentencing.[2]

## II. Analysis

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d) (2006). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2006); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

Initially, we note that the record reflects that a sentencing hearing was held on January 16, 2009, during which evidence was presented. The record before us does not contain a transcript of the sentencing hearing or a copy of the appellant's presentence report which was purportedly made an exhibit at that hearing.

At a hearing on February 2, 2009, the State submitted additional certified records pertaining to the appellant's prior felony convictions. These exhibits were also not included in the record for our review. At the February 2 hearing, defense counsel stated:

> If you'll recall, we had a sentencing hearing in this matter. We are in agreement that he has the requisite felony convictions that the State has alleged. Basically, all [the appellant] would be doing today would be asking you to run his sentence

---

[2] We note that the appellant maintains that the trial court determined the length of the sentences to be imposed by considering factors not permitted by Blakely v. Washington, 542 U.S. 296 (2004) or State v. Gomez, 239 S.W.3d 733 (Tenn. 2007). However, the appellant was sentenced under the 2005 amendments to the sentencing act, which were passed to remedy the concerns raised by Blakely. See State v. Carter, 254 S.W.3d 335, 342-43 (Tenn. 2008); Gomez, 239 S.W.3d at 738-41.

concurrently and to give us a motion date for a motion for new
trial.

The rules of appellate procedure clearly state that "the appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b); see also Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). This court has repeatedly cautioned that "[i]n the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). In its appellate brief, the State argued that the appellate record was inadequate for review of the appellant's sentencing issues. We agree. Despite having the record's failings brought to his attention, the appellant failed to move to have the record supplemented with the required materials. Generally, in light of an inadequate appellate record, we would presume the trial court correctly sentenced the appellant.

Although not raised by the appellant, we note as plain error that the trial court should have merged the kidnapping convictions into one single judgment of conviction of especially aggravated kidnapping. See Tenn. R. App. P. 36(b). Kidnapping is a continuous offense. See State v. Legg, 9 S.W.3d 111, 117 (Tenn. 1999). The indictment charged the appellant with four separate counts of kidnapping arising from the same offense but based upon alternative theories. Specifically, the especially aggravated kidnapping conviction was based upon the appellant's use of a deadly weapon. See Tenn. Code Ann. §§ 39-13-305(a)(1) and 39-13-302. The appellant's three aggravated kidnapping convictions were based upon the appellant's unlawfully removing or confining the victim to facilitate rape (count four), the victim's suffering bodily injury (count five), and the appellant's possession of a deadly weapon (count six). See Tenn. Code Ann. § 39-13-304(a)(1), (4), and (5). "When a jury convicts under alternative theories, a merger and imposition of a single judgment of conviction protects against double jeopardy and avoidance of problems related to unnecessarily dismissed charges or convictions." State v. Billy Harris, No. W2003-01911-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 691, at *23 (Jackson, Aug. 4, 2004)(quoting State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997) (internal quotations omitted).

### III. Conclusion

We conclude that the judgments of conviction for the especially aggravated kidnapping and the aggravated kidnappings should be vacated and the case is remanded for entry of a judgment of especially aggravated kidnapping that includes the merged aggravated kidnapping convictions. The appellant's consecutive fifty-year sentences for two counts of

aggravated rape and his concurrent sentences of fifty years for especially aggravated kidnapping and fifteen years for aggravated assault are affirmed. The total effective sentence shall remain one hundred years.

_____

NORMA McGEE OGLE, JUDGE